936 F.2d 573
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
S. Archer GREEN, Philip D. Hightower, Theodore T. Fountain,
Lawrence M. Fountain, Jan R. Goergen, Robert
Fletcher, and James Ramey, Plaintiffs,
and Defendants on Counterclaim-Appellees,
v.
Stewart T. SMYTHE, Defendant, and Plaintiff on Counterclaim-Appellant,
and Ironsides, Inc., Defendant on Counterclaim-Appellee.
 No. 90-6131.
 United States Court of Appeals, Sixth Circuit.
 July 3, 1991.
 
 Before RALPH B. GUY, Jr. and DAVID A. NELSON, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 The parties to this action are the officers and investors of Ironsides, Inc., a corporation formed by the parties in 1980 to manufacture passenger tires under the tradename "Ironsides." Appellant Stewart Smythe served as promoter and a director for the corporation and ultimately as its president. After approximately four months in that position, Appellees (hereinafter Plaintiffs)--the capital investors in Ironsides, Inc.--removed Smythe from his position as president and director amid cross-charges of mismanagement on his part and fiduciary misconduct on the part of the Plaintiffs.
 
 
 2
 On February 11, 1981, Plaintiffs filed this action in district court advancing three claims against Smythe: Count I sought a declaratory ruling that Plaintiffs were the sole shareholder in Ironsides, Inc.; Count II alleged Smythe fraudulently induced their investment in the company; and Count III stated a claim for abuse of process against Smythe for his unauthorized filing of a Chapter 11 Petition on behalf of the corporation.[1]
 
 
 3
 Smythe filed a Counterclaim raising three claims: Count I claimed breach of an employment agreement; Count II alleged Plaintiffs had fraudulently induced Smythe to incur certain obligations, including reaffirmation of certain existing obligations which he had incurred as President and shareholder of Ironsides, Inc.'s predecessor corporation; and Count III advanced a shareholder derivative claim alleging Plaintiffs had breached their fiduciary duties to the company.
 
 
 4
 In 1982, the district court granted summary judgment in favor of Plaintiffs as to Count I of Smythe's Counterclaim. This Circuit affirmed that order in Case No. 82-5448 (May 16, 1983) (Unpublished Per Curiam). On February 9, 1990, the district court entered summary judgment dismissing Count III of Smythe's Counterclaim on the grounds that he was not a shareholder in Ironsides, Inc. Three months later, on May 11, 1990, the court granted summary judgment dismissing Count II of the Counterclaim without prejudice on the basis that, as a matter of law, Smythe had demonstrated no damages. On this appeal, Smythe challenges these latter two orders. We have examined the record, and for the reasons that follow we affirm.
 
 I.
 
 5
 We review de novo a grant of summary judgment by the district court. McAdoo v. Dallas Corporation, No. 90-3690, slip op. (May 7, 1991); Pinney Dock & Transport Co. v. Penn Central Corp., 838 F.2d 1445, 1472 (6th Cir.), cert. denied, 488 U.S. 880 (1988). Summary judgment is appropriate where the available evidence, viewed in a light most favorable to the non-movant, shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); accord Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir.1988); see also Blakeman v. Mead Containers, 779 F.2d 1146, 1150 (6th Cir.1985). The party opposing the motion must receive the benefit of any reasonable inferences the facts will support; however "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); accord McAdoo, supra, slip op. at 3-4.
 
 
 6
 Appellant Smythe contends that in each of the following issues the evidence on the record, viewed in his favor, raises a genuine issue of material fact that precluded disposition by summary judgment.
 
 A. Smythe's Shareholder Status
 
 7
 Count III of Smythe's counterclaim stated a shareholder's derivative action alleging Green and the other plaintiffs had wasted corporate assets and usurped corporate opportunities. Under Kentucky law, Smythe must have been a shareholder in Ironsides, Inc. in order to bring such a claim. K.R.S. Sec. 271B.7-400(1). Accordingly, summary judgment would be proper if a rational trier of fact could not conclude that Smythe was a shareholder based upon the record as a whole. See Celotex Corp., 477 U.S. at 322-23; Matsushita Elec. Indus. Co., 475 U.S. at 587.
 
 
 8
 Smythe offers various documents that he maintains support his claim of stock ownership. These items include personal discussion notes and correspondence created by some of the plaintiffs during the formation and early operation of Ironsides, Inc. Most of these material are handwritten, cryptic, and inconclusive. Smythe also offers certain other documents that he prepared during the course of Ironsides' creation. Smythe suggests that these documents, taken together, raise a genuine factual question concerning his stock ownership.
 
 
 9
 Smythe's principal evidence in support of his alleged stock ownership is a document he prepared that purports to summarize the discussions that transpired between Smythe and the Plaintiffs at a meeting in Virginia Beach, Virginia on July 12-13, 1980. This summary recites an alleged agreement between Smythe and the Plaintiffs concerning the issuance of penny stock to management.[2] Smythe would receive 2,608 shares in Ironsides for a purchase price of $26.08 conditioned upon management's presentation to the capital investors (the Plaintiffs) of a management plan guaranteeing the safe return of the investors' initial capital--approximately $468,000. Once Smythe had paid the stipulated price, the shares were to be "escrowed in the Company's safe deposit box together with signed stock powers giving the Executive Committee of the Company the right to transfer these shares if the officers of the company have not presented the investors with a plan...." Plaintiff Green disputes that the parties ever agreed to this arrangement; nevertheless, for purposes of summary judgment we may assume such an agreement existed.
 
 
 10
 Smythe contends that he paid the $26.08 purchase and was, therefore, a stockholder notwithstanding the escrowed nature of the shares. However, a sale of stock is not completed where the shares are placed in escrow and the condition necessary for completion of the sale is not satisfied. See, e.g., Binns v. United States, 385 F.2d 159 (6th Cir.1967) (Order) (shares placed in escrow until full consideration paid); see also Fletcher Cyc. Corp. Sec. 5567 (perm. ed.) (Title to stock subject to an escrow agreement does not pass "until the conditions are performed, or, perhaps, until delivery of the stock to the vendee, and does not relate back to the time when the stock was deposited"). The face of the meeting summary clearly indicates the parties intended consideration for management's purchase of shares to consist of the plan to return the Plaintiffs' initial capital investment as well as the payment of the one cent per share price. The record reveals that Smythe was legally dismissed before he presented the required plan. Thus, because the precondition to completion of the sale failed, Smythe's purchase was never completed. Under these circumstances, Smythe could not be a shareholder based on the agreement in the Virginia meeting summary.
 
 
 11
 At oral argument, Smythe argued that no evidence disclosed the alleged shares were actually placed in escrow. This valid observation does not go far enough: in point of fact, the scant record before us offers little evidence from which a jury could conclude that Smythe's alleged shares were ever even issued. First, the record contains stock certificates, albeit unsigned, bearing the names of the Plaintiffs; however, the record reveals no such certificates bearing Smythe's name, despite the undisputed fact that Smythe himself prepared the certificates. Second, Smythe, under penalty of perjury, signed and filed a Subchapter S Election form with the Internal Revenue Service (IRS) that purported to list all of the shareholders in Ironsides, Inc. Smythe did not identify himself as a shareholder in the company on this form. Finally, Smythe states in his deposition that his alleged shares were never issued and did not exist. In the face of this and other persuasive evidence contradicting his shareholder status, Smythe offers only his payment of $26.08 to support the claim that he was a shareholder. This showing does not suffice to raise a genuine issue of material fact for trial. See McAdoo v. Dallas Corp., No. 90-3690, slip op. at 4 (May 7, 1991) ("[S]ummary judgment may be granted where the evidence is merely colorable or is not significantly probative.").
 
 B. Smythe's Alleged Damages
 
 12
 Count II of Smythe's Counterclaim against the Plaintiffs alleged that Plaintiffs' actions and representations "were intended to induce" Smythe to undertake his promotion efforts prior to incorporation on behalf of Ironsides, Inc. and to induce him to "advance monies, enter into new debt agreements, and reaffirm prior guarantee agreements ... [thereby incurring] obligations of $1,049,000.00...." Smythe asserts he has sustained actual damages in that amount. In addition, Smythe asserts an unspecified and conclusory allegation that the "actions and representations of the [P]laintiffs were intended and calculated to mislead and to operate as a fraud and deceit on Smythe," entitling him to punitive damages of $1,000,000.00.
 
 
 13
 Clarifying these claims in his response to Plaintiffs' interrogatories, Smythe stated his actual damages consisted of a "personal debt of $25,000 in favor of his father, Frederick J. Smythe (evidenced by demand notes), ... $74,000 in favor of Archer Green" and $950,000 in personal debt guarantees that he reaffirmed to the Business Development Corporation of Kentucky and the Kentucky Industrial Development Finance Authority. The district court determined that Smythe's compensatory damage request, based upon these financial obligations, stated claims for restitution and indemnification. Finding that both these claims require satisfaction of the obligation by the obligor, and further finding no evidence that any of Smythe's creditors had actually sought to collect his debts, the court granted summary judgment. The court held that Smythe's damages, if any, were purely conjectural until a claim had been made and he had paid the debt. The court found that permitting recovery before Smythe's own liability had been determined "could very well lead to the anomalous situation in which [Smythe] would reap a windfall in the form of an award of indemnity or restitution for an obligation which he has never incurred."
 
 
 14
 At oral argument, Smythe contended the district court mistakenly viewed his claim as one for indemnification and restitution. He asserted his theory of recovery rests in the alleged fraud executed on him by the Plaintiffs. We disagree. None of Smythe's allegations concerning his actual damages even suggests fraud in Plaintiffs' alleged inducements. If Smythe intended to state a claim for fraud, his allegations fall far short of the particularity required for that cause of action by Fed.R.Civ.P. 9(b).[3] See Arnold v. Arnold Corp., 920 F.2d 1269, 1279-80 (6th Cir.1990).
 
 
 15
 Smythe's Complaint fails to state a claim for fraud on which relief may be granted. Nonetheless, his factual assertions do suggest that Smythe assumed the alleged obligations on behalf of Ironsides, Inc. and that the benefit from the transactions actually inured to the corporation. Accordingly, we do not believe the district court erred in construing Count II as a claim for common law indemnification and restitution.
 
 
 16
 Relying on the "monies advanced" as the basis of his claim, Smythe also contends that the $25,000 he provided to cover pre-incorporation salaries for managers hired from Ironsides' predecessor, IRI, Inc., constitutes a "solid loss" to him that is immediate in nature. However, his response to Plaintiffs' interrogatory makes clear that this sum was not out of his own pocket because he borrowed it from his father. Smythe directs this Court to no evidence in the record indicating that Smythe's father has sought collection of the debt. Accordingly, the character of the alleged loss arising from the $25,000 payment is indistinguishable from the other losses Smythe has alleged--speculative and anticipatory. Finding no error in the legal principles applied by the district court, we hold accordingly that summary judgment dismissing this claim without prejudice was proper.
 
 II.
 
 17
 For the foregoing reasons, the district court's orders granting summary judgment in favor of Appellees on Counterclaim on Counts II and III of Smythe's Counterclaim are AFFIRMED.
 
 
 
 [1]
 Immediately after his dismissal, Smythe filed a Chapter 11 Petition in Bankruptcy for Ironsides, Inc., claiming to be the sole director and sole shareholder in the corporation. That proceeding was filed in U.S. Bankruptcy Court for the Western District of Kentucky on November 25, 1980. In February 1981, Smythe voluntarily dismissed the proceeding
 
 
 [2]
 The SUMMARY OF VIRGINIA BEACH MEETING OF JULY 12-13, 1980 actually refers to "two initial offerings of shares" and a "capitalization offering." The first initial offering was to be made to Smythe and two other managers, James Allison and J. Ludemann, at a cost of one cent per share subject to the escrow provision described above. All of the shares Smythe alleges he owns are the product of this "first initial offering." The "second initial offering" consisted of a total of 74 additional shares to Allison and Ludemann, again at one cent per share. This offering was not made subject to the escrow provisions. Under the "capitalization offering" 6,688 shares were to be issued to the seven named plaintiffs at a cost of $70.00 per share, resulting in $468,160.00 in total paid-in capital
 
 
 [3]
 The allegations that Smythe makes in the body of his Counterclaim concerning the identified financial obligations do not satisfy this particularity requirement. Under Kentucky law, an action for fraud or deceit requires proof of six elements: (1) that the defendant made a material representation; (2) that the representation was false; (3) that when the defendant made it he knew it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention of inducing plaintiff to act, or that it should be acted upon by the plaintiff; (5) that plaintiff acted in reliance on it; and (6) that plaintiff thereby suffered injury. Sanford Construction Co. v. S & H Contractors, Inc., 443 S.W.2d 227, 231 (Ky.App.1969); Cresent Grocery Co. v. Vick, 194 Ky. 727, 240 S.W. 388 (1922)
 Paragraph 34 dealing with the $75,000 note to Appellee Green states that Smythe signed the note "[u]nder duress and threat of breach of his employment contract...." It makes no allegation of fraud. In paragraph 37, Smythe states he advanced the $25,000 for the payroll "[a]fter discussion and agreement between" himself and Green; however, he neglects to identify any specific allegedly false material representation on which he relied. Finally, in paragraph 46, Smythe alleges he reaffirmed his obligations to the Business Development Corporation of Kentucky and the Kentucky Industrial Development Finance Authority in reliance on "the oral agreements between the parties." Presumably, these oral agreements were made at the Virginia Beach meeting; however, Smythe offers no specifics concerning the details of the particular agreement or agreements upon which he relied. It is impossible to determine whether the alleged inducements consisted of deliberate material misrepresentations by the Plaintiffs or were merely good faith misunderstandings that occasionally occur between parties in the course of negotiations. Given these deficiencies, the allegations in Count II essentially distill down to a claim that Smythe borrowed money to invest in a business venture that later proved unfruitful. Such a claim would not entitle Smythe to relief.